MCI WORLDCOM COMMUNICATIONS, INC., and MCIMetro Access Transmission Services, LLC, Petitioners,

v.

PUBLIC UTILITY COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued May 6, 2003.

Decided May 29, 2003.

Reargument Denied July 17, 2003.

Kathleen Misturak–Gingrich, Harrisburg and Daniel Weiss, Chicago, IL, for petitioner.

Matthew Totino, Harrisburg, for respondent.

Julia A. Conover, Philadelphia, for intervenor, Verizon PA, Inc.

BEFORE: PELLEGRINI, Judge, LEAVITT, Judge and JIULIANTE, Senior Judge.

OPINION BY Judge PELLEGRINI.

MCI WorldCom Communications, Inc. and MCIMetro Access Transmission Services, LLC (collectively, MCI) appeal from a decision and order of the Pennsylvania Public Utility Commission (PUC) holding that due to an order of the Federal Communications Commission (FCC), a "change-in-law" provision in an Interconnection Agreement between MCI and Verizon Pennsylvania, Inc. (Verizon) "permitted" an amendment to their rate schedule.

The Interconnection Agreement that is at issue in this case was entered into as a result of The Telecommunications Act of 1996(Act), 47 U.S.C. §§ 251–261. That Act abolished exclusive communication franchises and allowed competing local telephone companies to enter the local telephone service market. Prior to the enactment of this Act, Verizon's predecessor, Bell Atlantic–Pennsylvania, Inc., was the sole local telephone company providing service in Pennsylvania where it was authorized to do business. Section 251 of the Act, 47 U.S.C. § 251, required Verizon to provide MCI with non-discriminatory access to its network and services and required the parties to enter into interconnection agreements.[1]

MCI and Verizon entered into an Interconnection Agreement which the PUC approved. Under the Interconnection Agreement, MCI and Verizon agreed to bill and pay invoices for reciprocal compensation for calls to Internet Service Providers (ISPs), companies that provide their customers with the ability to obtain on-line information through the use of the Internet, pursuant to a rate schedule[2] agreed

---

1. More specifically, the Act required the incumbent local-exchange carrier (LECs), in this case, Verizon, to provide to competitors who entered the local market (CLECs), in this case, MCI, interconnection with its existing network and to establish reciprocal compensation agreements for transporting and terminating the calls placed by each other's customers. 47 U.S.C. § 251(b)(5). Reciprocal compensation is a form of inter-carrier compensation that is designed to compensate a carrier for completing a call for another carrier.

2. Section 4.2 of the Interconnection Agreement provides that:

upon by the parties. The Interconnection Agreement also contained a provision that addressed circumstances when the rate schedule had to be amended to account for changes in the law. Specifically, Section 1.1 of Attachment 1 to the Agreement, the Price Schedule, provided, in relevant part: [3]

> The rates or discounts set forth in Table 1 below may be subject to change and shall be replaced on a prospective basis (unless otherwise ordered by the FCC, the Commission, or the reviewing court(s)) by such revised rates or discounts as may be ordered, approved or permitted to go into effect by the FCC, the Commission or a court of applicable jurisdiction, as the case may be. Such new rates or discounts shall be effective immediately upon the legal effectiveness of the court, FCC, or Commission order requiring such new rates or discounts.

With the growth of the Internet, however, LECs, including Verizon, disputed whether reciprocal compensation should also apply to traffic going to an ISP. They contended that there was a disproportionate flow of one-way traffic which, in turn, led to the disproportionate payment of reciprocal compensation from the LEC of the end user to the LEC of the ISP.[4] On April 27, 2001, the FCC issued an order (FCC Order) [5] in which it determined that ISP calls were expressly excluded from the reciprocal compensation obligations of the Act because they were a form of interstate traffic. However, because carriers incurred costs when they exchanged calls to ISPs, the FCC concluded that intercarrier compensation was necessary and established a new and interim inter-carrier compensation rate schedule for ISP traf-

> Reciprocal compensation for the exchange of Local Traffic is set forth in Table 1 of this Attachment and shall be assessed on a per minute-of-use basis for the transport and termination of such traffic.

3. Section 2.2 of the Interconnection Agreement further provided:

> In the event the FCC promulgates rules or regulations, or issues orders or a court of competent jurisdiction issues orders which make unlawful any provision of this Agreement, or which materially reduce or alter the services required by statute or regulations and embodied in this Agreement, then the Parties shall negotiate promptly and in good faith in order to amend the Agreement to substitute contract provisions which conform to such rules, regulations or orders. In the event the Parties cannot agree on an amendment within thirty (30) days after the date any such rules, regulations or orders become effective, then the Parties shall resolve their dispute under the applicable procedures set forth in Section 24 (Dispute Resolution Procedures) hereof.

4. Initially, in February 1999, the FCC issued a declaratory ruling determining that Internet calls were largely interstate and did not man-

date reciprocal compensation for these calls; however, it would not interfere with state utility regulatory commission findings as to whether reciprocal compensation provisions of interconnection agreements were applicable to ISP-bound traffic. In what is referred to as the "Global Order," *See Joint Petition of Nextlink Pennsylvania, Inc. et al,* 196 P.U.R. 4th 172, 1999 Pa. PUC (September 30, 1999), the PUC decided that ISP-bound traffic should be treated as local traffic for purposes of reciprocal compensation. MCI appealed the FCC's decision to the United States Court of Appeals for the District of Columbia Circuit which sustained the challenge and vacated the FCC's declaratory ruling because it failed to provide a satisfactory explanation as to why it classified ISP calls as interstate traffic not subject to reciprocal compensation. The Court of Appeals remanded the matter to the FCC for further consideration. *See Bell Atlantic Telephone Companies v. Federal Communications Commission,* 206 F.3d 1 (D.C.Cir.2000).

5. *See In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996, Intercarrier Comp. for ISP–Bound Traffic,* FCC 01–131, CC Docket Nos. 96–98, 99–68, 2001 WL 455869 (rel. April 27, 2001).

fic.[6] The new rate schedule was intended to replace the current system of reciprocal compensation unless parties were entitled to take advantage of change-of-law provisions that would provide for the immediate implementation of the new rates.[7] The reciprocal compensation rates for the termination of ISP calls were to be capped and phased out over a three-year period, but only if the LEC offered to exchange all traffic subject to Section 251(b)(5) at the same rate. Regarding the applicability of the FCC Order to existing interconnection agreements, the FCC stated the following:

> The interim compensation regime we establish here applies as carriers re-negotiate expired or expiring interconnection agreements. **It does not alter existing contractual obligations, except to the extent that parties are entitled to in-voke contractual change-of-law provisions.** (Bold added.)

(Paragraph 82 of FCC Order.)

Because Verizon and MCI could not agree on whether the FCC Order "permitted" Verizon to implement the new rate schedule, Verizon filed a petition with the PUC for a determination. Verizon contended that the FCC Order "permitted" it to invoke the change-of-law provision in the Interconnection Agreement and implement the new rate schedule as of June 14, 2001, and once the FCC released its order and provided for the interim inter-carrier compensation schedule, that order permitted new rates to go into effect. MCI, however, argued that Section 1.1 of the Attachment to the Agreement did not apply because nothing in the FCC Order either required or permitted a change in rates, and that if the language of the existing Interconnection Agreement did not

6. The new rates were as follows:

> Beginning on the effective date of this Order, and continuing for six months, inter-carrier compensation for ISP-bound traffic will be capped at a rate of $.0015/minute of use (mou). Starting in the seventh month, and continuing for eighteen months, the rate will be capped at $.0010/mou. Starting in the twenty-fifth month, and continuing through the thirty-sixth month or until further Commission action (whichever is later), the rate will be capped at $.007/mou. In addition to the rate caps, we will impose a cap on total ISP-bound minutes for which a LEC may receive this compensation. For the year 2001, a LEC may receive compensation, pursuant to a particular interconnection agreement, for ISP-bound minutes up to a ceiling equal to, on an annualized basis, the number of ISP-bound minutes for which that LEC was entitled to compensation under that agreement during the first quarter of 2001, plus a ten percent growth factor. For 2002, a LEC may receive compensation, pursuant to a particular interconnection agreement, for ISP-bound minutes up to a ceiling equal to the minutes for which it was entitled to receive compensation under that agreement in 2001, plus another ten percent growth factor. In 2003, a LEC may receive compensation, pursuant to a particular interconnection agreement, for ISP-bound minutes up to a ceiling equal to the 2002 ceiling applicable to the agreement.

(Paragraph 78 of FCC Order.)

7. The FCC found that requiring reciprocal compensation payments for Internet-bound traffic was contrary to sound public policy and retarded the growth of local telephone competition because CLEC's "have been targeted ISPs as customers merely to take advantage of these intercarrier payments" and "compete, not on the basis of quality and efficiency, but on the basis of their ability to shift costs to other carriers." (FCC Order at 2, 4; Reproduced Record at 473a–474a.) The FCC further found that requiring reciprocal compensation for ISP-bound traffic was interfering with the development of competition because the CLECs' decisions were "driven by regulatory opportunities that disconnect costs from end-user market decisions ... This result distorts competition by subsidizing one type of service at the expense of others." (FCC Order at 5; Reproduced Record at 474a–475a.)

mandate a change, then only new agreements were required to implement the changes. It also filed a counterclaim for the payment of reciprocal compensation at the old contract rates for ISP calls during the months of June through October 2001, which Verizon had withheld. Verizon filed an answer and affirmative defenses to the counterclaim.

Without holding an evidentiary hearing because the parties agreed there were no material facts in dispute,[8] the Administrative Law Judge (ALJ) issued a decision concluding that the FCC Order was not intended to apply to existing interconnection agreements because neither the FCC, the PUC nor the courts had ordered any changes to the rates on the rate schedule, and that MCI had no contractual obligation to agree to the new rates because no provision of the Interconnection Agreement had been rendered unlawful. In her decision, the ALJ stated:

> The change-of-law provisions at issue here do not apply because the FCC in its *ISP Remand Order* did not intend the Order to alter existing agreements, or to mandate application of the interim compensation regime either as of the effective date of the Order or at any other definite time. Had it done so, there is no question that the interconnection agreement would have to be revised accordingly. The FCC could have done exactly this; the fact that it did not indicates that the FCC recognized that operating under the reciprocal compensation regime is appropriate until "expired or expiring" agreements are renegotiated, so that the interim compensation regime can be prospectively applied.

(ALJ's November 16, 2001 decision at 10.) The ALJ further found that any amendment to the Interconnection Agreement had to be negotiated by the parties and approved by the PUC to be effective. The ALJ then ordered Verizon to pay past due reciprocal compensation under the rate structure the parties agreed to in their Interconnection Agreement.

Verizon filed exceptions to the ALJ's initial decision, and by order dated May 29, 2002, the PUC reversed the decision of the ALJ after concluding that the FCC Order triggered the change-of-law provision in Section 1.1 of the Interconnection Agreement's pricing schedule, and that the reciprocal compensation rates under the Interconnection Agreement were to be modified to reflect those permitted to be in effect by the FCC Order. Analyzing the language of Section 1.1 of the Interconnection Agreement, the PUC stated:

> Applying the rate-specific change-of-law provision to this case, it is clear that the new rates should be incorporated into the Interconnection Agreement. The FCC explicitly stated that change-of-law provisions might cause the new rates to take effect during the terms of existing interconnection agreements; therefore, the new rates were "ordered, *approved or permitted* to go into effect by the FCC." With regard to when the new rates should take effect, the second sentence of the rate-specific change-of-law provision calls for the new rates to take effect upon the legal effectiveness of the FCC order. (Emphasis added.)

(PUC's May 29, 2002 decision at 13.) The PUC then went on to explain what it believed to be the error of the ALJ's analysis, stating:

---

**8.** A pre-hearing telephone conference was held with both MCI and Verizon participating. Because both parties agreed there were no material facts in dispute, an evidentiary hearing was not scheduled. Instead, the parties filed main briefs. In lieu of reply briefs, oral argument was held.

[T]he ALJ places too great an emphasis on the word "requiring" in the second sentence of the rate-specific change-of-law provision. Taken in context, the second sentence addressed *when* the new rates will take effect. The question of *whether* new rates will take effect is controlled by the first sentence. Moreover, the word "requiring" in the second sentence (as well as the word "establishing" in the third sentence) must be read together with the words "ordered, approved or permitted" in the first sentence. "Requiring" should not be interpreted to mean something different than "ordered, approved or permitted" because to do so would leave open the question of when rates take effect if the rates were held to be only "ordered, approved or permitted" but not "required." (Emphasis in original.)

*Id.* at 14–15. The PUC further found that the new rates became effective June 14, 2001, the date of the FCC Order. Finally, the PUC denied MCI's counterclaim and ordered the parties to adopt a retroactive amendment incorporating the FCC Order's rate structure. This appeal by MCI followed.[9]

The issue now before us is whether the PUC's interpretation of the Interconnection Agreement allowing Verizon to implement new rates as a result of the FCC Order was proper. In *Drummond*, we set forth the standard by which we review an interpretation of a contract provision. We stated:

[T]he initial question is a legal one—whether the language [in the agreement] is ambiguous. If it is clear, it is a question of law. If it is ambiguous, however, what the agreement means is determined by the surrounding facts and circumstances and that is a decision for the trier of fact. (Citations omitted.)

... If the court determines that the language is ambiguous, then it is for the trier of fact to determine what the parties intended by resolving conflicts in the relevant parole evidence. Initially, the court must ascertain whether the intent of the parties only as manifested by the language is clear.

*Id.* at 580. Under this standard then, the first question is a legal one, one in which we have plenary review—whether Section 1.1 of the Interconnection Agreement clearly states that Verizon is permitted to implement new rates.

Each of the respective parties suggest its reading of Section 1.1 of the Interconnection Agreement is clear and unambiguous: the PUC and Verizon contend that the FCC's Order applies to Section 1.1 because it is a change-of-law provision, and the language in Section 1.1 "permits" Verizon to implement the new rate schedule and "requiring" means the same things as "permitted" in the first sentence. MCI contends that the FCC Order does not require the implementation of new rates to existing contracts unless the change-of-law provision so mandates, and Section 1.1 does not allow Verizon to implement the

---

9. Our scope of review (the confines within which an appellate court must conduct its examination) of the PUC's decision is limited to determining whether constitutional rights have been violated, an error of law committed, or findings and conclusions of law were supported by substantial evidence. *City of Chester v. Pennsylvania Public Utility Commission*, 798 A.2d 288 (Pa.Cmwlth.2002). Our standard of review (the manner in which that examination is conducted) is whether the PUC's decision to enforce the change-of-law provision was in accordance with the standard set forth in *Drummond v. University of Pennsylvania*, 651 A.2d 572 (Pa.Cmwlth. 1994), *petition for allowance of appeal denied*, 541 Pa. 628, 661 A.2d 875 (1995). *See Morrison v. Commonwealth of Pennsylvania, Department of Public Welfare*, 538 Pa. 122, 646 A.2d 565 (1994).

new rate schedule because, in the sentence immediately following the one with the word "permitted," it states that any new rates are only effective "upon the legal effectiveness of the court, FCC or PUC order *requiring* such new rates or discounts." Based upon our review of Section 1.1 of the Interconnection Agreement, as well as the different interpretations placed on this provision by the ALJ and the PUC, neither of those interpretations is clear and a fair reading of that provision shows that it is nothing other than ambiguous. Section 1.1 can be interpreted to mean either that Verizon is "permitted" to implement new rates based on the FCC's Order that makes the term "requiring" in the second sentence superfluous, or that it cannot implement new rates until "required" to do so by an explicit order of the FCC, PUC or a court, making the term "permitted" in the first sentence correspondingly superfluous.

Because Section 1.1 is not clear but ambiguous, our standard of review then determines whether the PUC engaged in proper fact-finding in arriving at its decision. In this case, the PUC held no hearings and took no evidence that would be necessary to make a proper determination; instead, it treated the question of interpreting the language in the Interconnection Agreement as a matter of law. Because the PUC failed to make the necessary findings of fact, we remand the matter to the PUC to hold an evidentiary hearing and to determine the intent of the parties as to the meaning of Section 1.1 of the Interconnection Agreement. Accordingly, the decisions of the PUC are vacated and the case is remanded to the PUC for fact-finding in accordance with this decision.

Judges McGINLEY and COHN recuse.

## ORDER

AND NOW, this 29th day of May, 2003, the orders of the Public Utility Commission dated May 29, 2002, and August 30, 3002, are vacated and the case is remanded to the Public Utility Commission to hold an evidentiary hearing for fact-finding in accordance with this decision.

Jurisdiction relinquished.