**CITY OF CHESTER, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

**Norfolk Southern Railway Company, Petitioner,**

v.

**Pennsylvania Public Utility Commission, Respondent.**

**County of Delaware, Petitioner,**

v.

**Pennsylvania Public Utility Commission, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 9, 2002.
Decided May 1, 2002.

---

No Appearance entered on behalf of petitioners, City of Chester.

Benjamin C. Dunlap, Jr., Harrisburg, for petitioner, Norfolk Southern Railway Co.

Susan D. Colwell, Harrisburg, for respondent.

Jason D. Sharp, Harrisburg, for intervenor, Department of Transportation.

Before PELLEGRINI, Judge, LEAVITT, Judge, and DOYLE, Senior Judge.

OPINION BY Judge PELLEGRINI.

Before this Court are objections filed by Norfolk Southern Railway Company (Norfolk Southern) to an order of the Pennsylvania Public Utility Commission (Commission) allocating it costs for the repair and maintenance of the Lloyd Street Bridge (Bridge).

By order dated October 6, 1997, the Commission instituted an investigation to determine the condition and responsibility for maintenance of the Bridge carrying Lloyd Street above-the-grade of the track of Amtrak in Delaware County because no party agreed to accept responsibility for maintaining the Bridge. The Pennsylvania Department of Transportation (Penn-

Dot), the City of Chester (City), the County of Delaware (County), National Railroad Passenger Corporation (Amtrak), Consolidated Rail Corporation (Conrail) and the Southeastern Pennsylvania Transportation Authority (SEPTA) were made parties to the proceeding.

At the hearings, Amtrak testified that although 54 of its trains operated daily on the line, it was exempt under federal law from contributing to the costs of repairs and maintenance because such costs constituted a tax or fee. Conrail argued that although it operated four trains per day on the line, because it did not own any property on the rail line and only operated on the line pursuant to an operating agreement with Amtrak to whom it paid a fee, it should not be responsible for maintenance costs. The City argued that it would be unreasonable to require it to pay for maintenance because it had been declared financially distressed pursuant to the Municipalities Financial Recovery Act.[1] SEPTA argued that pursuant to a consent decree it entered into with the Commission in another case, it was agreed that it could not be assessed costs or responsibility for the construction, maintenance or repair of any highway bridge. Finally, PennDot argued that it did not receive any benefit from the Bridge and should not be required to pay for its maintenance.

After hearings, the Administrative Law Judge (ALJ) made recommendations to the Commission which it adopted. The Commission entered an order on September 1, 2000, allocating the costs and work to be performed as followed:

(a) 75% of the costs to furnish all materials and perform all work necessary to maintain the substructure, superstructure and deck of the bridge was allocated to the City which was to perform the work;

(b) the remaining 25% of the costs was divided among Conrail (15%), the County (5%) and PennDot (5%).

(c) Amtrak was exempted from contribution based upon 49 U.S.C. § 23401($l$), and SEPTA was exempted from contribution based on a consent decree between SEPTA and the Commission in a separate matter. *See Southeastern Pennsylvania Transportation Authority v. Pennsylvania Public Utility Commission*, 826 F.Supp. 1506 (E.D.Pa.1993) (*SEPTA II*), *affirmed per curiam*, 27 F.3d 558 (3rd Cir.1994), *cert. denied*, 513 U.S. 928, 115 S.Ct. 318, 130 L.Ed.2d 279 (1994), and *Southeastern Pennsylvania Transportation Authority v. Pennsylvania Public Utility Commission*, 802 F.Supp. 1273 (E.D.Pa.1992) (*SEPTA*).

The City, County and Conrail filed petitions for review with this Court from that order arguing that the Commission erred in failing to allocate any costs to either Amtrak or SEPTA based on our decision in *City of Philadelphia v. Pennsylvania Public Utility Commission*, 676 A.2d 1298 (Pa.Cmwlth.), *petition for allowance of appeal denied*, 546 Pa. 657, 684 A.2d 558 (1996), *cert. denied*, 520 U.S. 1155, 117 S.Ct. 1334, 137 L.Ed.2d 494 (1997). In that case, we held that Amtrak was to be allocated costs associated with the repair and maintenance of certain bridges because, although it was exempt from paying taxes imposed by a state agency pursuant to 49 U.S.C. § 23401($l$), the allocation of costs did not constitute a tax. As to SEPTA, we noted that the consent decree between the Commission and SEPTA did not bind the court and also deprived the parties who were not a party to that decree their due process right to a full and fair hearing. By opinion and order dated April

---

**1.** Act of July 10, 1987, P.L. 246, *as amended,* 53 P.S. §§ 11701.101–11701.501.

27, 2001, while retaining jurisdiction, we vacated the Commission's September 1, 2000 order and remanded the case to the Commission for a hearing to reallocate costs to all of the parties involved, including Amtrak and SEPTA.

Pursuant to our remand order, hearings were held before an ALJ who recommended to the Commission that:

- the City be assigned physical maintenance responsibility for the substructure, superstructure and deck, at its initial cost and expense.
- PennDot reimburse the City 5% of it costs.
- the County of Delaware reimburse the City 5% of its costs.
- Amtrak, SEPTA and Norfolk Southern [2] each reimburse the City 5% of its costs.

Regarding Amtrak, SEPTA and Norfolk Southern's allocation, the ALJ noted that the Bridge was constructed in 1899 by the Pennsylvania, Washington and Baltimore Railroad Company and was nearing the end of its useful life; the Bridge was repaired in approximately 1946; it had a posted weight limit of five tons and was in poor condition. The ALJ then found that Amtrak had performed maintenance to the superstructure of the Bridge by repairing the wood structure of stringers with steel members in 1998 and by placing protective shielding to protect its facilities on the Bridge; Amtrak did the work when structural members failed and created a hazard

for train and bus operation; Norfolk Southern, Amtrak and SEPTA benefited from a separated crossing by being afforded an uninterrupted and unimpeded rail crossing, thus avoiding possible accidents and liability claims that could occur at a grade crossing; therefore, an at-grade crossing would not be prudent; and Norfolk Southern operated four trains per day; Amtrak operated 54 trains per day; SEPTA operated 60 trains each weekday, 30 trains on Saturday and 24 trains on Sunday. In all instances, the ALJ determined that ownership of the Bridge was not the sole determining fact in the allocation of cost and work responsibilities at rail highway crossings.[3]

Accepting the recommendations of the ALJ, the Commission then issued an order dated September 7, 2001, allocating costs as follows:

9. That the City of Chester, at its initial cost and expense, furnish all material and perform all work necessary to maintain the substructure, superstructure and deck of the Lloyd Street rail-highway bridge crossing; all in a safe and satisfactory condition.

10. That [Amtrak], [SEPTA], [Norfolk Southern], the [County] and [PennDot] reimburse the [City] in an amount equal to 25% of the costs incurred by the [City] in maintaining the substructure, superstructure and deck of the bridge, exclusive of the wearing surface, curbs and sidewalks on the bridge, in the following proportions:

---

**2.** Norfolk Southern became the successor in interest to Conrail. Conrail ceased operating its lines as of June 1, 1999, and Norfolk Southern began operations on the line that same date.

**3.** The ALJ also recommended that the City be assigned at its sole cost and expense maintenance responsibility for the approaches to the crossing and perform an in-depth inspection and report regarding the Bridge condition

every year, and that Amtrak, at its initial cost and expense, be responsible for the provision of watchmen and flagmen for all rail operations, including Amtrak, SEPTA and Norfolk Southern operations, during maintenance work with Amtrak to bear 45% of the costs and 55% of costs to be reimbursed to Amtrak as follows: 10% from Norfolk Southern and 45% from SEPTA.

(a) Amtrak—5%

(b) SEPTA—5%

(c) Norfolk Southern—5%

(d) County of Delaware—5%

(e) PennDot—5%

\* \* \*

■ 15. That [Amtrak], at its initial cost and expense, provide watchmen and flagmen, if necessary, and any and all other protection necessary for all rail operations, including those of [Norfolk Southern], [Amtrak] and [SEPTA], during performance of the maintenance and inspection work ordered in Ordering Paragraphs 9, 12, and 13 hereof.

16. That [Norfolk Southern] and [SEPTA] reimburse [Amtrak] in an amount equal to 55% of the costs incurred by [Amtrak] in complying with Ordering paragraph 15, in the following proportions:

(a) [Norfolk Southern]—10%

(b) [SEPTA]—45%

Norfolk Southern filed exceptions to those cost recommendations. By order dated October 18, 2001, this Court advised all of the parties that in accordance with our previous order of April 27, 2001, any party desiring to challenge the Commission's order was to file a statement as to why it was in error. Only Norfolk Southern filed objections [4] to the Commission's decision which are now before this Court.[5]

Norfolk Southern contends that the Commission does not have jurisdiction to allocate maintenance costs to it because only the owner of property and facilities at a rail crossing is liable for maintenance obligations.[6] It argues that it is undisputed that Amtrak is the owner and operator of the line at the Lloyd Street crossing, that Lloyd Street is a City owned and maintained street, and Norfolk Southern owns no property or facilities at the affected crossing.[7]

4. By order dated October 18, 2001, we directed any party objecting to any portion of the Commission's September 7, 2001 opinion and order to file a short statement of objections.

5. Our scope of review of the Commission's order is limited to determining whether constitutional rights have been violated, an error of law committed, or findings and conclusions of law were supported by substantial evidence. *Montour Trail Council v. Pennsylvania Public Utility Commission*, 547 Pa. 367, 690 A.2d 703 (1997).

6. Citing language from *Lehigh Valley R.R. Co. v. Pennsylvania Service Commission*, 105 Pa.Super. 423, 161 A. 422 (1932), Norfolk Southern uses the term "presence and ownership" when it is referring to the allocation of costs. In that case, Lehigh Valley contested the allocation of costs to it for the abolition of the grade crossing over Lehigh Valley's tracks and for the construction of a new bridge to connect with a relocated state highway. Although Lehigh Valley argued that it should only have to pay an amount in proportion to the benefit it received, our Superior Court found no merit in that argument.

"This proposition finds no support in the statute nor in any decision of either of the appellate courts of this Commonwealth. By the terms of the statute the cost of construction may be imposed on the companies or municipal corporations 'concerned.' It is well settled that railroad corporations may be required at their own expense, not only to abolish existing grade crossings, but also to build and maintain suitable bridges or viaducts to carry highways, newly laid out, over their tracks or to carry their tracks over such highways. .... *It is the presence and ownership of the track involved....*which places liability on the railroad."

*Id.* at 424, 161 A. 422. (Emphasis added.) The case seems to hold that for costs to be imposed, not only does the railroad have to own the right-of-way, but it also has to have tracks present. Because the track is present in this case and ownership is not at issue, we will refer to the matter involved as dealing solely with ownership.

7. Norfolk Southern also refers to the Northeast Corridor Agreement it has with Amtrak allowing it to use Amtrak's tracks stating that

In opposition, the Commission argues that it is not only the owner of the railroad who may be allocated costs because each crossing case must be considered separately under the circumstances presented. The Commission explains that it is possible for an entity to own but not operate over the tracks in which case the operator would be the public utility subject to the Commission's jurisdiction. Conversely, the owner may not be a public utility and could not be allocated any costs or responsibilities. Therefore, it is not simply the ownership of facilities or property at a rail-highway crossing which subjects an entity to allocations. Rather, a review of all relevant factors, including the usage of the crossing, is necessary.

In *City of Philadelphia v. Pennsylvania Public Utility Commission*, 676 A.2d 1298 (Pa.Cmwlth.1996), *petition for allowance of appeal denied*, 546 Pa. 657, 684 A.2d 558, *cert. denied*, 520 U.S. 1155, 117 S.Ct. 1334, 137 L.Ed.2d 494 (1997), we explained the underlying reason why the Commission allocates costs to a railroad as owner of a rail line stating:

> At common law, when a private corporation constructed a railroad which made a bridge necessary at the crossing of a highway, imposed on the private corporation was the duty not only of constructing the bridge but also of maintaining the bridge to enable the public to safely use the highway. Elliott, The Law of Roads and Streets, § 41 (2d ed.1900). *See Smith v. Pennsylvania Railroad Company*, 201 Pa. 131, 50 A. 829 (1902). This common law duty was

considered an imperative one and could be enforced by mandamus. Elliott, *supra* at § 41. If the railroad company refused to perform its duty to keep a crossing in repair, the municipality where the crossing was located could repair it and recover the cost of those repairs from the railroad company by bringing an action in court. *Id.* at § 785. *Pittsburgh, Virginia & Charleston Railway Company v. Commonwealth*, 101 Pa. 192 (1882).

During the same period, highways, roads and streets were placed under the control of the municipalities through which they ran and the state withdrew from actively building and from maintaining those highways, roads and streets. *Westmoreland Chemical & Color Company v. Public Service Commission*, 294 Pa. 451, 144 A. 407 (1928). Once the municipalities had control over the roads within their borders, the responsibility for maintenance was assigned in agreements between the municipalities and the railroad companies as part of the municipalities' agreement to the placement of the crossings. *SEPTA I*, 592 A.2d at 803. If either party failed to fulfill its part of the agreement, the other party could seek to compel performance of maintenance responsibilities. *Id.* at 804. "This situation is analogous to a common driveway with shared maintenance responsibilities where if one party does not perform or agree to reconstruction, the other party can sue for specific performance." *Id.*

pursuant to that Agreement, it has paid Amtrak for any maintenance costs associated with its line. It points out that it pays Amtrak for the use of its rail line at a cost of one dollar per freight car mile, and makes additional payments to Amtrak as compensation for a portion of the financial responsibility for liability representing its fair and equitable share of the cost to Amtrak for Norfolk Southern's operations on the line, including any Bridge reconstruction. Therefore, it argues that under 66 Pa.C.S. § 2704(a), the Commission does not have the authority to allocate it any costs relative to that crossing. However, we need not reach this issue based on how we have decided this case.

*Id.* at 1305–1306. We further explained that legislation which created the Public Service Commission in 1913 (now the Public Utility Commission) conformed with the common law duty on the railroad companies to ensure the public safety. Under that same legislation, the Commission was given power to allocate costs involved with a new crossing to municipalities because their streets were involved in the crossing, as well as reform any existing easement agreement or order because no party had the absolute right to occupy a right-of-way making any agreement or order defeasible. *See Bell Atlantic–Pennsylvania, Inc. v. Commonwealth of Pennsylvania, Turnpike Commission,* 703 A.2d 589 (Pa. Cmwlth.1997), *aff'd,* 552 Pa. 41, 713 A.2d 96 (1998) (location by public utility within public right-of-way is merely a privilege which is revocable and does not constitute a proprietary interest in permanent location of the facility in the public right-of-way).

■ Because it is the ownership interest at the crossing, not mere usage that gives the Commission the authority to allocate costs, Pennsylvania courts have historically held that it is the ownership of the rail line involved that places liability on the railroad for costs associated with a crossing, including repairs, removal, reconstruction or maintenance. *See Consolidated Rail Corporation v. Pennsylvania Public Utility Commission,* 55 Pa.Cmwlth. 576, 423 A.2d 1108 (1980) (Conrail, as successor in interest to Reading Railroad, who agreed to forever maintain a bridge over its tracks, was solely responsible for maintenance costs of deteriorating bridge); *Pennsylvania Public Utility Commission v. Southeastern Pennsylvania Transportation Authority,* 21 Pa.Cmwlth. 106, 343 A.2d 371 (1975) (SEPTA alone allocated costs of repairs for bridge it owned under which rail lines ran); *Lehigh Valley R.R. Co.* (Railroad allocated costs of construc-

tion of new bridge over its tracks). Each of these cases clearly indicates that it is the ownership of the individual utility assessed costs that is responsible for the maintenance that is relevant to the determination.

■ If we were to adopt the Commission's argument, any utility that merely utilized the right-of-way could be allocated costs associated with the maintenance of the crossing, or, for that matter, for the reconstruction of the Bridge because it has use of one of the right-of-ways involved in the crossing. For example, if United Parcel Service, as a common carrier, had a facility on one side of the Lloyd Street Bridge and its trucks had to cross over the Bridge every day to reach the facility, it could be assessed costs associated with the Bridge merely because it used the Bridge. However, because usage of property alone is not a justification for imposing cost allocations at crossings and because an owner of a railroad with a crossing over its line is the party responsible for costs associated with that rail line, and there is no dispute that Amtrak, not Norfolk Southern, is the owner of the rail-line and crossing at issue, the Commission abused its discretion in allocating 5% of the maintenance costs of the Bridge to Norfolk Southern.

Because the 5% allocation to Norfolk Southern is a percentage of the cost attributable to the Amtrak tracks, the 5% allocation made to Norfolk Southern is now allocated to Amtrak. Accordingly, the objections of Norfolk Southern are granted and in all other respects the order of the Commission is affirmed.

### ORDER

AND NOW, this 1st day of *May,* 2002, because the 5% allocation to Norfolk Southern is a percentage of the cost attributable to the Amtrak tracks, the 5% al-

location made to Norfolk Southern is now allocated to Amtrak. The objections of Norfolk Southern are granted and in all other respects the order of the Commission is affirmed.