77 A.3d 619

NORFOLK SOUTHERN RAILWAY COMPANY, Appellee

v.

PUBLIC UTILITY COMMISSION, Appellant.

Pennsylvania Department of Transportation, County of
Lancaster, East Hempfield Township, Intervenors.

Supreme Court of Pennsylvania.

Argued March 6, 2013.

Decided Oct. 2, 2013.

Gina M. D'Alfonso, Esq., Jason D. Sharp, Esq., PA Department of Transportation, for Department of Transportation, Intervenor.

Deanne M. O'Dell, Esq., Mark Scott Stewart, Esq., Eckert Seamans Cherin & Mellott, LLC, Harrisburg, Kyle Jarrett Meyer, Esq., for County of Lancaster, Intervenor.

Theresa A. Monglovi, Esq., Angela Holt Sanders, Esq., Blakinger Byler & Thomas, P.C., for East Hempfield Township, Intervenor.

Elizabeth A. Lion Januzzi, Esq., Bohdan R. Pankiw, Esq., Eric Albert Rohrbaugh, Esq., PA Public Utility Commission, for Public Utility Commission.

Scott Everett Coburn, Esq., for PA State Association of Township Supervisors, Appellant Amicus Curiae.

Benjamin Charles Dunlap Jr., Esq., Nauman, Smith, Shissler & Hall, L.L.P., Harrisburg, for Norfolk Southern Railway Company.

Sara Aliya Aliabadi, Esq., Christian David Sheehan, Esq., Nancy L. Winkelman, Esq., Schnader Harrison Segal & Lewis LLP, Philadelphia, for The Keystone State Railroad Assoc, Consolidated Rail Corp., CSX Transportation, Inc., Appellee Amicus Curiae.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice SAYLOR.

This appeal concerns the limits of the Public Utility Commission's authority to allocate costs associated with a rail-highway crossing project. We consider the Commonwealth Court's holding that the Commission may not allocate costs to a transportation utility which regularly uses a crossing site in railroad operations but does not own real property or facilities there.

## I. Background

Per Section 2702(a) of the Public Utility Code, the Pennsylvania Public Utility Commission (the "PUC" or the "Commission") has jurisdiction over construction, alteration, relocation, suspension, and abolishment (collectively, "alterations") of rail-highway crossings. *See* 66 Pa.C.S. § 2702. Before alterations may be undertaken, the Commission's approval must be obtained. *See id.* § 2702(a). Furthermore, the agency directs the manner and conditions under which alterations, operations, maintenance, and protection are undertaken, in furtherance of public safety. *See id.* § 2702(b). Indeed, upon its own motion or otherwise, the Commission may require alterations to be made "by *any public utility* or municipal corporation *concerned* or by the Commonwealth," among others. *Id.* § 2702(c) (emphasis added). Most relevant here, the PUC also is responsible generally to allocate the costs of alterations to rail-highway crossings among "concerned" parties and the Commonwealth, as follows:

> [T]he cost of [alterations and protection of a rail-highway] crossing … shall be borne and paid … *by the public utilities, municipal corporations [or] municipal authority … concerned, or by the Commonwealth,* in such proper proportions as the commission may, after due notice and hearing, determine, unless such proportions are mutually agreed upon and paid by the interested parties.

*Id.* § 2704(a) (emphasis added).[1]

The Colebrook Road Bridge in East Hempfield Township, Lancaster County, was long part of a grade-separated, rail-highway crossing. The bridge carried a local road above train tracks owned and used by the National Railroad Passenger Corporation, also known as Amtrak. Pursuant to an express, written easement and an operating agreement with Amtrak, Appellee, Norfolk Southern Railway Company ("Norfolk"), operates freight trains on the same tracks.

---

1. The statutory scheme also permits the imposition of responsibility to undertake alternations, as well as allocation of costs, to certain non-profit organizations under delineated conditions, *see* 66 Pa.C.S. §§ 2702(c), (h), 2704(a), provisions which are not relevant here.

Over the years, the condition of the bridge deteriorated, and, in 2003, the PUC directed the Township to remove it. The Township bore the bulk of the initial expense, subject to a later, final allocation of costs among concerned parties per Section 2704(a).

Norfolk, the Township, the County, the Pennsylvania Department of Transportation ("PennDOT"), and Amtrak participated in the ensuing, final cost allocation proceeding. For its part, Norfolk contended that any allocation to it would be unjust and unreasonable, since the company owned no property or facilities at the crossing site and paid Amtrak for the privilege of operating on that railroad's line. Norfolk also cited *City of Chester v. PUC*, 798 A.2d 288 (Pa.Cmwlth.2002), for the proposition that the PUC lacked authority to allocate costs to a transportation utility which had no ownership interest associated with a rail-highway crossing. *See id.* at 294 ("[I]t is the ownership interest at the crossing, not mere usage that gives the Commission the authority to allocate costs[.]").

Norfolk highlighted *City of Chester's* explanation that this ownership focus, relative to transportation utilities, traces to the common law mandate upon railroads laying tracks to construct and maintain bridges necessary to continued, safe use of intersecting road systems. *See id.* at 293 (quoting *City of Phila. v. PUC*, 676 A.2d 1298, 1305 (Pa.Cmwlth.1996)). *City of Chester* further observed that this duty evolved into a shared one with municipalities, and, thus, the court took the position that the track-owning railroads and local governments were the core parties "concerned" with rail-highway crossing projects at the time the Public Service Commission, and later, its successor, the PUC, attained jurisdiction over such projects. *See id.* at 294 (quoting *City of Phila.*, 676 A.2d at 1305–06).

Upon her review, an administrative law judge (the "ALJ") rejected Norfolk's position and recommended allocation of $78,816—or fifteen percent of the primary disputed amount of allocable costs ($525,441)—to Norfolk. *See* Recommended Decision on Final Cost Allocation ["Recommended Decision"],

*Investigation of Crossing Structure Carrying Colebrook Road Above the Grade of the Tracks of [Amtrak] in East Hempfield Twp., Lancaster Cty. ["Investigation"]*, I–00000088, *slip op.* at 17, Finding of Fact ["FF"] ¶ 73 (Pa. PUC June 1, 2010) (citing, *inter alia, Nat'l. R.R. Passenger Corp. v. PUC,* 848 F.2d 436 (3d Cir.1988)). As to the Township, the County, PennDOT, and Amtrak, the ALJ recommended allocation of seventy percent ($367,809), ten percent ($52,544), five percent ($26,-272), and zero percent, respectively. *See id.*

Underlying her recommendation, the ALJ explained that the Commission generally is not limited to any fixed rule or formula in cost apportionment, but, rather, takes all relevant circumstances into account. *See, e.g., AT & T v. PUC,* 558 Pa. 290, 306, 737 A.2d 201, 209 (1999). As a frame of reference, the ALJ cited a series of nonexclusive factors collected in *Greene Twp. Bd. of Supervisors v. PUC,* 668 A.2d 615 (Pa. Cmwlth.1995), including the following considerations:

1. The party that originally built the crossing. Related to this factor is the issue of whether the road existed before or after the construction of the crossing;

2. The party that owned and maintained the crossing;

3. The relative benefit initially conferred on each party with the construction of the crossing;

4. Whether either party is responsible for the deterioration of the crossing that has led to the need for its repair, replacement or removal; and

5. The relative benefit that each party will receive from the repair, replacement or removal of the crossing.

*Id.* at 619 (citations omitted).[2] The ALJ also related that the Commission's decision must have sound factual and legal bases and be just and reasonable. *See* Recommended Decision, (I–00000088, *slip op.* at 21 (citing *Greene Twp.,* 668 A.2d at 618).)

**2.** Additionally, the ALJ noted, the Commission has also considered benefits to concerned utilities and their ratepayers, the availability of state or federal funding for the project, relative responsibilities among the concerned parties connected to the rail-highway crossing site, and prevailing equities arising from the circumstances. *See* Recommended Decision, I–00000088, *slip op.* at 21 (citing Order, *Application of City of Wilkes–Barre,* No. A–00101606, slip op. (Pa. PUC Apr. 9, 1981)).

With regard to the fifteen-percent allocation to Norfolk, the ALJ determined that Norfolk enjoyed substantial benefits from the Colebrook Road Bridge during its existence, because the structure had facilitated the unimpeded movement of freight over the rail line Norfolk used and eliminated the increased risk of accidents associated with at-grade crossings. *See id.* at 18, FF ¶¶ 81–82. The ALJ also observed that Norfolk benefited from the bridge's removal, since its deteriorated condition threatened the safety of personnel and property and presented a potential source of disruption of railroad operations. *See id.* at 18, FF ¶ 83. Although the ALJ would have allocated a substantial portion of the project costs to Amtrak (as the owner and primary user of the tracks running through the crossing area and, per the ALJ's findings, a party whose dilatory conduct substantially increased the expense of the crossing project), she found that Amtrak was exempt, under federal law, from assessments of costs for maintenance, repair, or alteration of local rail-highway crossings. *See id.* at 32 (citing, *inter alia, Nat'l. R.R. Passenger Corp. v. PUC*, 848 F.2d 436 (3d Cir.1988)).

As to *City of Chester*, the ALJ did not believe that the decision broadly foreclosed cost allocations to non-owner, transportation utilities. Principally, the ALJ reasoned that Commonwealth Court decisions prior to and after *City of Chester* consistently had recognized the PUC's broad, discretionary authority in cost-allocation matters and the agency's responsibility to consider all relevant factors, none of which by itself is necessarily determinative. *See id.* at 40–41 (citing *Greene Twp.*, 668 A.2d at 618; *Millcreek Twp. v. PUC*, 753 A.2d 324, 327 (Pa.Cmwlth.2000), and *SEPTA v. PUC*, 140 Pa.Cmwlth. 270, 290, 592 A.2d 797, 807 (1991)). Furthermore, the ALJ observed, *City of Chester* simply had not "discussed, distinguished, explained or overruled" the many decisions embodying these principles. *Id.* at. 41. She also did not accept Norfolk's position that such cases should be distinguished on the basis that they involved municipalities or utilities which actually owned property at a crossing site, since none of the decisions was premised on rationale supporting

such a distinction. *See id.* Finally, the ALJ emphasized that the statutory framework for PUC cost allocations draws no distinction based on ownership but, rather, invests the Commission with broad authority to allocate costs among "concerned" parties. *Id.* (quoting 66 Pa.C.S. § 2704(a)).

Norfolk, among others, filed exceptions. In response, the Commission adopted the ALJ's proposed findings and conclusions in relevant part. With regard to *City of Chester,* the PUC reiterated that the decision is " 'at odds with other prior decisions of the Commonwealth Court' and 'should not be read as controlling or precedential with respect to cost allocation and work assignments in railroad/highway projects ordered by the Commission.' " Opinion and Order, *Investigation,* I–00000088, slip op. at 9 (Pa. PUC Sep. 17, 2010) (citation omitted).

Norfolk lodged an appeal, in which the Township, the County, and PennDOT (collectively, "Intervenors") intervened, and the Commonwealth Court reversed in a memorandum opinion. *See Norfolk S. Ry. Co. v. PUC,* 2157 C.D. 2010, slip op., 2011 WL 10858169 (Pa.Cmwlth. Dec. 1, 2011). In material part, the panel credited Norfolk's argument that *City of Chester* precludes the allocation of costs to transportation utilities which do not own property or facilities at the site of a rail-highway crossing. *See id.* at 19–20, 2011 WL 10858169 at *10. As in *City of Chester,* the panel reasoned that Section 2704(a) should be understood in light of the common law pertaining to rail-highway crossings. *See id.* (stating that "Pennsylvania courts, dating back at least to [1932,] hold that it is the ownership of the rail line involved that places liability on the railroad for costs associated with repair, replacement or removal of a crossing" (citing *Lehigh Valley R.R. Co. v. Pub. Serv. Comm'n.,* 105 Pa.Super. 423, 428, 161 A. 422, 424 (1932))). Further, the panel quoted portions of the following excerpt from *City of Chester:*

If we were to adopt the Commission's argument, any utility that merely utilized the right-of-way could be allocated costs associated with the maintenance of the crossing, or, for that matter, for the reconstruction of the [b]ridge because it has

use of one of the right-of-ways involved in the crossing. For example, if United Parcel Service, as a common carrier, had a facility on one side of [a rail-highway bridge crossing] and its trucks had to cross over the [b]ridge every day to reach the facility, it could be assessed costs associated with the [b]ridge merely because it used the [b]ridge. However, ... usage of property alone is not a justification for imposing cost allocations at crossings[.]

*City of Chester*, 798 A.2d at 294. Responding to the observation that costs of crossing projects have been allocated to non-owner local governments and Commonwealth agencies with no property or facilities at the site, the panel pronounced that *City of Chester* should be read to place a "narrow limitation" on the Commission's broad, discretionary cost-allocation authority particular to railroads. *See Norfolk*, 2157 C.D. 2010, slip op. at 22–23, 2011 WL 10858169 at *11.

We allowed appeal to address the correctness of *City of Chester* in terms of implementing a rule premised on ownership, barring the PUC from allocating costs of rail-highway crossing projects to non-owner transportation utilities.

Presently, the Commission and Intervenors argue that the PUC has broad discretion not only to determine the allocation of costs to "concerned parties," but also to determine which parties are "concerned" in the first instance. *See, e.g.,* Brief for the Commission at 14 ("This Court has repeatedly recognized that the Commission's discretion in determining who are 'concerned parties' for purposes of allocating costs to such parties, is not based on any one factor, but on many factors."). They see no difference between Commission decision-making in terms of designating which parties are "concerned" (and thus are subject to discretionary cost allocations) and the act of making appropriate allocations of costs among such parties. *See, e.g.,* Brief for the County at 13 ("The Commonwealth Court's imposition of an artificial limitation on the Commission's authority based upon *City of Chester* is no different from previous attempts to limit the Commission's authority— regardless of the Commonwealth Court's effort to frame the

.

question in terms of 'who' can be considered for cost allocation.").

It remains the position of the Commission and Intervenors that Norfolk is a "concerned party" by virtue of its use of Amtrak's line under the Colebrook Road Bridge, and, accordingly, the Commission had jurisdiction and authority, per Section 2704(a), to allocate a portion of the costs of the bridge's removal to the company. Supportively, PennDOT offers a broad dictionary definition of "concerned" as being "interestedly engaged, involved." Brief for PennDOT at 11 (quoting WEBSTER'S 3RD NEW INT'L DICTIONARY, UNABRIDGED (1993)).

Along with Intervenors, the Commission regards *City of Chester* as eviscerating the longstanding all-relevant-factors test, in favor of a singular one—ownership. While acknowledging that ownership is a strong, probative factor in many cases, the PUC and Intervenors maintain that it is not necessarily dispositive in cost-allocation decision-making. Most pointedly, PennDOT opines that "*City of Chester* was wrongly decided because it misconstrues the cases it relied upon and is at odds with Section 2704 of the Public Utility Code granting exclusive jurisdiction to allocate costs to the Commission." Brief for PennDOT at 10 (citation omitted).

The PUC and Intervenors complain that the "narrow limitation" on Section 2704(a), which the panel recognized, inures only to the benefit of railroads. They find such preferential treatment to be inappropriate as they discern no statutory basis to support a non-owner railroad exemption. *See* Brief for the Commission at 19 ("[N]owhere in 66 Pa.C.S. § 2704 is there an exception for railroads requiring ownership of facilities at a crossing."). Relatedly, the PUC and Intervenors raise fairness concerns, observing that the County and Penn-DOT do not own property or facilities at the project site, yet the Commission allocated costs to them based on the benefit they received from the bridge. Again, they perceive no justification for a distinction between nonowner railroads and

governmental units in the Section 2704(a) setting.[3] Indeed, the County envisions broader unfairness in that "the practical consequence [of the panel's decision] will be a massive shifting of the burden for funding rail-highway projects from the entities that actually utilize the crossing to members of the public who may never utilize the crossing." Brief for the County at 7.

The PUC and Intervenors repeatedly reference this Court's admonition that Section 2704(a) is not subject to any mandatory, exclusive list of considerations. *See* Brief for the Commission at 22–23 (asserting that the intermediate-court panel's decision "constitutes an unwarranted impingement upon the PUC's statutorily imposed discretion, which was expressly rejected by this Court in *AT & T* " (citing *AT & T,* 558 Pa. at 306, 737 A.2d at 209)); *see also PECO Energy Co. v. PUC,* 568 Pa. 39, 57, 791 A.2d 1155, 1166 (2002) (explaining that the General Assembly has "explicitly afford[ed] the Commission wide discretion in determining the allocation of costs"). The Commission also stresses that the statutory definition of "public utility" broadly subsumes companies "operating" within the Commonwealth, 66 Pa.C.S. § 102, also suggesting that an ownership litmus is misguided. With regard to the common law background against which Section 2704(a) was written, as developed by the Commonwealth Court, the PUC regards the precepts, simply, as being "outdated and impractical." Brief for the Commission at 27.

Anticipating one of Norfolk's arguments, the County acknowledges that, consistent with the common law relied on by the intermediate-court panel, this Court has stated that a

**3.** *See, e.g.,* Brief for the Commission at 20–21 ("Why ... is a benefit analysis satisfactory to apply to any other non-owner entity, but not to a railroad? Where in § 2704 of the Public Utility Code is there such an exception or limitation on the Commission's discretion?"); *id.* at 22 ("Creating an exception solely for railroads is ... highly inequitable as it allows a party who receives a significant benefit from the crossing to avoid all financial responsibility for it."); *accord* Brief for PennDOT at 21 (*"City of Chester* creates an inequitable mandate where railroads are judged by one set of criteria under Sections 2702 and 2704 of the Public Utility Code, while PennDOT and other concerned parties are subjected to the traditional criteria that all relevant factors must be considered.").

transportation utility lacks any concern with a crossing, for purposes of cost assessment, "where it does not have a rail facility situated at such crossing." *Pittsburgh Railways Co. v. PUC*, 427 Pa. 562, 568, 237 A.2d 602, 606 (1967). Nevertheless, the County stresses, under the Public Utility Code, a utility need not own facilities to "have" them for purposes of regulatory law, since the definition of "facilities" includes plant and equipment "used" by the utility, 66 Pa.C.S. § 102, and, again, regulated utilities include those "owning or operating" designated facilities, *id.*[4, 5]

Norfolk, on the other hand, argues that the discernment of what the Legislature meant when it referred to "the public utilities ... concerned," in Section 2704(a), is a matter quite distinct from the separate, express, legislative grant of discretion to the Commission to determine the proper allocation among parties. 66 Pa.C.S. § 2704(a). According to Norfolk, the former undertaking squarely presents a matter of statutory construction for the plenary review of this Court. *See, e.g., Six L's Packing Co. v. WCAB (Williamson)*, 615 Pa. 615, 629–30, 44 A.3d 1148, 1157 (2012). This understanding, Norfolk explains, illustrates why the Commission was wrong to superimpose the "all relevant factors" test (which is the central consideration in discretionary cost allocation) upon the legal inquiry into legislative intent necessary to identify who is a

---

4. The County further indicates that there are a litany of intermediate-court decisions in which costs for crossing projects have been allocated to non-owner railroads. *See* Brief for the County at 13 (citing *Millcreek Twp.*, 753 A.2d at 328, *Consolidated Rail Corp. v. PUC*, 671 A.2d 248, 252 (Pa.Cmwlth.1995), and *Pa. Game Comm'n v. PUC*, 651 A.2d 596, 605 (Pa.Cmwlth.1994)). As Norfolk explains in its brief, however, none of the cited decisions supports the stated proposition. *See* Brief for Norfolk at 21 n. 17. The most similar one is *Consolidated Rail,* but in that case the administrative law judge found as a fact that the railroad owned some tracks at the relevant crossing site. *See Consolidated Rail,* 671 A.2d at 251.

5. The Pennsylvania State Association of Township Supervisors filed an *amicus* brief in support of, and consistent with, the Township's position. *See* Brief for Pa. State Ass'n of Twp. Supervisors at 11 ("Municipalities, Commonwealth agencies, and county governments have all been subject to cost allocations, even where they had no ownership interest in rail-highway crossings. There is no reason why railroads should be singled out for preferential treatment[.]").

concerned party in the first instance.[6] Employing a frame of reference derived from decisions cited by the Commission and Intervenors, Norfolk offers the following elaboration:

> Unlike in the present case, the "concerned party" status of AT & T, Sprint or the railroad involved was not at issue in *AT & T.* Here, of course, the "concerned party" status of Norfolk Southern was indeed at issue. It is only after a threshold determination of "concerned party" status is made that the PUC's broad discretion to allocate costs, the subject of the *AT & T* case, comes into play. Neither the Commonwealth Court Opinion below nor the *City of Chester* case in any way limits the relevant factors that can be considered in such an assessment under Section 2704(a), but rather merely limit the transportation utilities to which the relevant factors analysis can be applied when making a cost allocation.

Brief for Norfolk at 19; *see also id.* at 20 ("Again, 'concerned party' status was not an issue in *Greene Township,* and the factors listed in that case only become applicable once a party is deemed 'concerned' and therefore subject to cost allocation by the PUC.").

■ Norfolk appears to appreciate that interpretation or construction of a statute by an administrative agency is generally entitled to due deference upon judicial review. *See, e.g., Consolidated Rail Corp. v. City of Harrisburg,* 577 Pa. 71, 81, 842 A.2d 369, 375 (2004). Norfolk contends, nonetheless, that the Commission never actually engaged in statutory construction in the present case but, rather, merely followed what it believed was the relevant precedent. *See* Brief for Norfolk at 2 n. 1. Accordingly, it is Norfolk's position that no deference

---

6. *See* Brief for Norfolk at 9 ("The prerequisite of determining 'concerned party' status in no manner limits the 'relevant factors' that may be considered by the Commission in making a cost allocation, but instead limits the entities to which such cost allocations can be made."); *id.* at 19 (observing that concerned-party status simply was not at issue in this Court's decision in *AT & T ); id.* ("It is only after a threshold determination of 'concerned party' status is made that the PUC's broad discretion to allocate costs, the subject of the *AT & T* case, comes into play.").

whatsoever is due to the Commission relative to the concerned-party inquiry. *See id.*

Substantively, Norfolk seeks this Court's endorsement of *City of Chester's* ownership litmus for transportation utilities. Norfolk believes that the ownership focus arises out of Section 2702(a) of the Public Utility Code, which establishes the PUC's jurisdiction over rail-highway crossings in the first instance, *see* 66 Pa.C.S. § 2702(a), and in light of which, Norfolk asserts, Section 2704(a) must be read. Norfolk contends that Section 2702(a) limits the PUC's jurisdiction to allocate costs associated with crossing projects only to a transportation utility which has constructed "its facilities" across a highway or where a highway has been constructed across "the facilities of any such public utility," 66 Pa.C.S. § 2702(a). *See* Brief for Norfolk at 12 ("The usage of the possessive pronoun 'its' in conjunction with 'facilities' signifies that only transportation utilities that *own* facilities at rail-highway crossings are 'concerned parties' and therefore subject to cost allocation."). Indeed, as the County presaged, Norfolk relies upon this Court's conclusion in *Pittsburgh Railways* that "[t]he transportation utilities [c]oncerned for purposes of assessment under [Section 2704(a)'s predecessor] are those whose facilities are constructed or located at [the relevant] crossing." *Pittsburgh Railways*, 427 Pa. at 569, 237 A.2d at 606 (emphasis added); *accord Lehigh Valley R.R.*, 105 Pa.Super. at 428, 161 A. at 424 ("It is the presence and ownership of the track involved, not any benefit conferred, which places liability on the railroad."). Norfolk finds *City of Chester* to be in close accord with this line of authority.

Norfolk also differs with the County's position that a transportation utility can "have" facilities, for purposes of concerned-party status, which it does not own. Again, the company finds support in *Pittsburgh Railways,* as well as in common usage. *See* Brief for Norfolk at 13 n. 9 ("The first definition of 'have' in *Webster's Third New International Dictionary,* page 1039 (3d ed. 2002) is 'to hold in possession as property: own.'"). Norfolk takes no issue with the Commission's observation that the definition of "public utility" includes those

operating in the Commonwealth, *see* 66 Pa.C.S. § 102; however, it believes that the PUC's reliance on this definition disregards the central role, in Section 2704(a), of the modifier "concerned." 66 Pa.C.S. § 2704(a). According to Norfolk:

Under its incorrect and expansive interpretation of its jurisdiction, the PUC would have authority to allocate costs to a railroad whose only connection to a crossing was that its rail cars were being hauled by another railroad on the line, a common occurrence today, as such rail car equipment would be "operating" at the crossing.

Brief for Norfolk at 13 n. 10.

Counterbalancing the Commission's and Intervenors' remarks about the equities, Norfolk questions why it should contribute to the remediation of deteriorating infrastructure over which it had no control. Norfolk explains that the operating agreement governing its use of Amtrak's line affords Amtrak "exclusive control over the operation of the [line]," including "train dispatching, transportation supervision, maintenance of way, and all other services and facilities necessary for the operation and maintenance of the NEC Railroad Freight Routes and its use by Railroad's Freight Service." Amended and Restated Northeast Corridor Freight Operating Agreement at 5–6 (Feb. 1, 2006). Further, Norfolk asserts that it pays Amtrak "a monthly fee representing its fair and equitable share of the cost to Amtrak for Norfolk Southern's operations on the line." Brief for Norfolk at 16 (footnote omitted). While Norfolk recognizes the dilemma presented by the PUC's inability to allocate costs to Amtrak, it sees this as a consequence of a federal policy decision to shift costs from a beneficial, national passenger rail carrier to state and local governments which enjoy a substantial benefit from Amtrak's services. *Accord* Brief for *Amici* Keystone State Railroad Ass'n, Consolidated Rail Corp., and CSX Transp., Inc. at 14. Indeed, Norfolk's *amici* warn of unintended and perverse consequences which may result from the exposure of non-owning railroad companies to cost allocation. *See, e.g., id.* at 9 ("Exposure to unfair, uncertain, un-negotiated, and unpredictable costs in Pennsylvania may prompt rail-

roads to cut back on track-sharing arrangements, erasing many of the public benefits that such arrangements offer.").

Norfolk also complains that the Commission and Intervenors "misrepresent[ ] Norfolk Southern's interest as a leasehold." *See* Brief for Norfolk at 15 n. 12 (citing PUC Brief, Appx. C at 7; County Brief at 13). To the contrary, Norfolk asserts that it "merely operates at the subject crossing pursuant to its Freight Operating Agreement with Amtrak." *Id.; see also id.* ("Under the Freight Operating Agreement, Norfolk Southern has the mere right to use the property under Amtrak's direction and control, paying Amtrak a fee to the extent of its use, as compared to the exclusive control over the property afforded under a traditional 'lease' contract.") (citing BLACK'S LAW DICTIONARY 889–90 (6th ed. 1999)).[7] Like all others, Norfolk does not discuss its interest in Amtrak's line in terms of a right of way or easement.

## II. Analysis

### A. Plenary Review versus Abuse of Discretion

 Initially, we agree with Norfolk's position that the determination of what the General Assembly meant by the phrase "public utilities ... concerned," in Section 2704(a), is a matter of statutory construction, subject to this Court's plenary review. Norfolk's argument that Section 2704(a) invests the Commission with discretion to determine the "proper proportions" of costs to be allocated to concerned parties (or the Commonwealth)—but not to select the parties who will be subject to allocation on a discretionary basis—is fundamentally a correct one deriving from the plain text of Section 2704(a). The position of the Commission and Intervenors—which seeks to place the determination of concerned-party status under the same umbrella of administrative discretion as the proper-proportions inquiry—does not track the language of the statute, since the proviso implying discretion concerns the latter.

---

7. Norfolk's sensitivity in this regard seems somewhat misplaced, since its counsel characterized the operating arrangement as being in the nature of a lease at an initial cost-allocation hearing before an administrative law judge. *See* N.T., Mar. 27, 2001, at 75 (reflecting the representation of Norfolk's counsel that "[w]e're a lessee, basically.").

*See* 66 Pa.C.S. § 2704(a) ("[T]he cost of [alterations] of such crossing ... shall be borne and paid ... by the [parties] concerned, or by the Commonwealth, *in such proper proportions as the commission may, after due notice and hearing, determine[.]* " (emphasis added)). While the PUC's interpretation of its own enabling statute is entitled to some deference, *see Nw. Youth Servs., Inc. v. DPW*, 620 Pa. 140, 156–58, 66 A.3d 301, 311–12 (2013), here, the PUC's position that concerned-party status is entirely discretionary with the Commission is not a sound one.

■ That said, we differ with Norfolk's contention that the Commission is entitled to no deference concerning other aspects of its interpretation. Fundamentally, the PUC has maintained that concerned-party status for transportation utilities, under Section 2704(a), does not turn upon an ownership litmus. To the extent that this position is reasonable and persuasive, we may apply due deference and adopt it as a part of our own construction of Section 2704(a). *See id.*

### B. The Ownership Litmus

■ As reflected above, our undertaking in statutory interpretation is to determine the intent of the Legislature through the language of its prescriptions, where possible. *See* 1 Pa.C.S. § 1921(a), (b). Where ambiguities exist, we employ principles of statutory construction, including, among other considerations, evaluation of the occasion and necessity for the statute under review, consideration of the object to be attained, review of the previous legal landscape, and appreciation of the consequences of the particular interpretation. *See id.* § 1921(c)(1), (4)-(6). In terms of the former law, this Court has previously highlighted the importance of considering the extant common law at the time of a statute's enactment. *See, e.g., In re Rodriguez*, 587 Pa. 408, 414–15, 900 A.2d 341, 344–45 (2003).

In many respects, the statutory scheme for cost allocation associated with rail-highway crossing projects is an ambiguous one as to which refinement, over the decades, would have been

desirable. *See, e.g., AT & T,* 558 Pa. at 301–05, 737 A.2d at 207–09 (discussing the evolution of this Court's construction of an ambiguous portion of Section 2704 addressing the role of private cost-allocation agreements). Most relevant here, the Legislature has provided, at most, implicit guidance concerning the range of utilities which may be "concerned," for purposes of Section 2704(a), with a rail-highway crossing project.

As the County observes, the word "concerned," in its broadest sense, subsumes all utilities with any kind of interest in the crossing site. Such a broad construction would also sweep in the motor common carrier using the highway segment of a crossing to make and return from deliveries, per the example posited in *City of Chester, see City of Chester,* 798 A.2d at 294, and, of course, Norfolk, which conducts freight-rail operations regularly through the relevant crossing site. On the other hand, Norfolk's argument that the salient "concern" derives from ownership of facilities at the crossing site is also a plausible one, particularly as it is tethered to a core class of utilities as to which a substantial portion of the substantive content of Sections 2702 and 2704 seems to be directed. Moreover, the construction favored by Norfolk does derive some support from language used by this Court and the intermediate courts in their decisions over the years. *See, e.g., Pittsburgh Railways,* 427 Pa. at 568, 237 A.2d at 606; *Lehigh Valley R.R.,* 105 Pa.Super. at 428, 161 A. at 424. Additionally, Norfolk's construction has the advantage of avoiding the sort of overbreadth envisioned in the motor-carrier example related in *City of Chester.*

Looking to the common-law history, however, *City of Chester* contains only some relevant information. *See City of Chester,* 798 A.2d at 293–94 (quoting *City of Phila.,* 676 A.2d at 1305–06). At most, the decision (and the underlying opinion in *City of Philadelphia,* from which *City of Chester* took the common-law history), offered a one-dimensional thumbnail of the relevant common law landscape. For example, *City of Chester* and *City of Philadelphia* referenced only the common law as it concerned railroads which created crossings over

existing highways. *See City of Chester,* 798 A.2d at 293 (discussing situations in which, at common law, "a private corporation constructed a railroad which made a bridge necessary at the crossing of a highway...."). A different legal overlay applied, however, holding the government primarily liable for maintenance, where a highway was built to intersect an existing railroad. *See Reed v. Allegheny Cnty.,* 330 Pa. 300, 304–05, 199 A. 187, 190 (1938) (explaining that where a railway line had a right of way, "the duty of maintenance is upon the corporation or the public acquiring an easement across a way previously existing"). Since Section 2704(a) covers both scenarios, a full and fair assessment of the relevant common law would encompass the entire legal landscape; neither *City of Chester* nor *City of Philadelphia,* however, provided such an overview.[8]

This is only to say that the common-law history on which *City of Chester* is premised is incomplete, and, along these lines, it provides little insight regarding the responsibility of track-sharing railroads benefitting from an enforceable right of way but lacking an ownership interest in facilities at a crossing. For these reasons, the intermediate-court panels in this case and in *City of Chester* should not have relied on this truncated portrayal of the common law to fashion a non-textual ownership litmus restricting Section 2704(a)'s application, relative to transportation utilities.

Similarly, statements by this Court and the intermediate courts in cases which did not involve non-owner transportation utilities are not controlling here. While we recognize that broad proclamations taken from *Pittsburgh Railways* and *Lehigh Valley* lend substantial support to Norfolk's position, neither of those cases involved a nonowner transportation utility possessing a right of way through a deteriorated rail-

---

**8.** Indeed, *Reed* discusses a range of circumstances and factors impacting railroad liability at rail-highway crossings. *See Reed,* 330 Pa. at 304–05, 199 A. at 190. While *Reed* concerns liability for personal injuries sustained at a crossing, this was also the frame of reference of some of the cases and references from secondary materials relied upon by the Commonwealth Court in *City of Chester* and *City of Philadelphia,* from which the former quoted.

highway crossing and regularly conducting operations there.[9] Thus, we view the present case as presenting an issue of first impression.

Returning to the relevant principles of statutory construction, in terms of the occasion and necessity for Section 2704(a), it seems clear enough that the General Assembly wished to foster order, efficiency, certainty, and finality in the resolution of the wide range of disputes arising over responsibilities associated with rail-highway crossing sites. The means the Legislature chose towards this end was to delegate the cost-allocation responsibility to the PUC. *See* 66 Pa.C.S. §§ 2702, 2704.

Like so many other remedial efforts undertaken in a complex social and political landscape, the Assembly's solution has not been a complete one, in terms of fostering the desired improvements. For example, regarding finality and certainty, with some reasonable justification, the Commission has taken to issuing some cost-allocation decisions without prejudice to the rights of concerned parties to pursue contract-based claims in a judicial forum. *See AT & T,* 558 Pa. at 299, 737 A.2d at 206.

Nevertheless, the overarching intent of the Legislature relative to administrative cost allocation, we believe, was to bring before the Commission, for an equitable allocation of costs, all parties having a substantial interest in rail-highway crossing sites and projects, beyond that which is coterminous with members of the general public at large (such as the interests of motor common carriers merely using the public highway at a crossing for deliveries, *i.e.,* the *City of Chester* example). Local governments and the Commonwealth obvi-

9. *See, e.g., Six L's Packing,* 615 Pa. at 630–31, 44 A.3d at 1158 (explaining that the holding of a judicial decision is to be read against the facts presented to the reviewing court); *cf. Schering–Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.,* 586 F.3d 500, 512 (7th Cir.2009) (explaining that "uncritical generalization is a path to error" and that "[o]ne form of uncritical generalization ... is reading general language literally"); *Oliver v. City of Pittsburgh,* 608 Pa. 386, 394–95, 11 A.3d 960, 965–66 (2011) (discussing the phenomenon of loose language in judicial opinions, which is not to be substituted for focused analysis, particularly pertaining to matters outside the scope of an opinion).

ously share the requisite sort of interest, as they are by nature concerned with the public safety of their residents. We also believe that the Commission's implicit decision that railroad companies possessing a right-of-way through a crossing—albeit they may not actually own facilities local to the crossing—also are concerned is consistent with this overarching purpose.

Notably, Norfolk necessarily acknowledges partial jurisdiction and power, on the Commission's part, relative to the allocation of costs to the company for the protection of its own operations at crossing sites. *See* Brief of Norfolk at 14 (recognizing that the PUC does have limited cost-allocation authority relative to "a mere operating railroad" pertaining to "costs in connection with their own operations at the crossing, but not for the crossing itself"). The difficulty with Norfolk's conception of limited jurisdiction or power is that the company is unable to identify a statutorily-based principle cabining the Commission's cost-allocation authority, once jurisdiction is acknowledged. The best Norfolk is able to do is to offer an analogy to fixed utilities. *See id.* Such analogy, however, is unhelpful to Norfolk, since the Commission's jurisdiction/authority relative to cost-allocation for fixed utilities stems from the very presence of "facilities at or adjacent to [a] crossing," 66 Pa.C.S. § 2704(a), a very different scenario from than that which Norfolk envisions applies to itself (as a non-owner transportation utility).[10] Moreover, since fixed utilities often benefit from rail-highway crossings primarily through piggybacking upon existing rights of way, the equities suggest against exacting upon them cost of more general alterations to the physical crossing site, beyond the expense necessary to the relocation of their own facilities (at least in the absence of exceptional circumstances). Norfolk, however, enjoys a benefit from crossing sites at large—through which it conducts daily railroad operations and over which it maintains a right of

10. Consistent with the bulk of its brief, Norfolk's response here might be to say that the lack of facilities is precisely the reason why the Commission lacks jurisdiction or authority. The difficulty, however, is that we are presently addressing the portion of Norfolk's brief that acknowledges partial jurisdiction and/or limited authority.

way—directly associated with the purpose of the infrastructure that was there. Accordingly, Norfolk's analogy to fixed utilities as a means of constricting the Commission's cost-allocation jurisdiction over the company is unpersuasive.

In other words, consistent with Norfolk's acknowledgment of partial jurisdiction, both a non-owner railroad regularly conducting operations at a crossing site and a fixed utility with facilities there would be concerned parties relative to a major crossing project. In this regard, either a party is "concerned" (and thus subject to discretionary cost allocation) or it is not (and therefore the Commission lacks discretion to allocate costs to such party). Once concerned-party status is confirmed, the Commission's decision-making is tethered by the requirements of sound factual and legal bases. *Accord Greene Twp.*, 668 A.2d at 618.[11]

We acknowledge that there are a host of policy considerations, as ably advanced by Norfolk, its *amici*, the Commission, and Intervenors, relevant to the cost exposure of railroad entities engaging in the beneficial sharing of tracks. Offsetting Norfolk's position to a degree, we add that there is the potential for companies to exploit high-threshold limitations on exposure to costs benefitting their businesses through the

11. Norfolk does not reference a decision holding that the Commission is jurisdictionally precluded from assessing costs against a fixed utility beyond the cost of relocation of its own facilities, say, in a case where a crossing's overall infrastructure required material modifications to accommodate those facilities. This circumstance is not presently before us, and thus, we will not address it further at present. Our purpose here is merely to say that, once the cost-allocation power is acknowledged—as it is by Norfolk—Norfolk does not benefit from the same natural limiting principle applicable to fixed utilities.

We also offer no opinion concerning Norfolk's example of a railway utility attaching cars to another's engine. We note only that this scenario is far removed from the present one, wherein Norfolk maintains an easement-based right-of-way over the Northeast Corridor attained through a succession in interest dating to the original track owner, and which is enforced through ongoing operating agreements with Amtrak pertaining to track segments owned by the latter. *See* Amended and Restated Northeast Corridor Freight Operating Agreement at 1–3 & Ex. A (Feb. 1, 2006).

Finally, we do not address the equities associated with the Commission's decision to assess costs against Norfolk, as this is not among the issues selected for review here.

structuring of corporate entities and arrangements.[12] More-over, the record presented offers little means to determine the impact of crossing-project liability relative to the profit margins of non-owner railroads. Thus, our ability, as compared to the General Assembly, to make an overarching policy judgment is very modest.[13]

Finally, we recognize the difficulty arising from Amtrak's non-liability for costs incurred in rail-highway crossing projects, as enforced by federal courts having jurisdiction in Pennsylvania. *See generally* Bohdan R. Pankiw, *A Case of Irreconcilable Differences With the Federal District Court: An Agency Caught in a Judicial Vise Grip*, 21 WIDENER L.J. 213 (2011). Nevertheless, this can have little to do with a policy judgment made decades earlier by the Pennsylvania General Assembly, in delegating to the Commission the jurisdiction and authority to allocate costs to public utilities concerned with such project sites.

We hold that a transportation utility need not own facilities at a rail-highway crossing to be a concerned party for purposes of the PUC's cost-allocation jurisdiction and authority, at least where the utility conducts regular operations at the crossing and may enforce an easement-based right of way.

The order of the Commonwealth Court is vacated, and the matter is remanded for consideration of issues which were

12. We are by no means suggesting that this is presently the case. Rather we appreciate that Amtrak's present retention of an ownership interest in some track lines in Pennsylvania derives from Congress's efforts to resuscitate the railroad industry by splitting the passenger and freight components and implementing extraordinary measures relative to passenger railway transportation. *See generally* 74 C.J.S. RAILROADS §§ 645–646, 727 (2013).

13. *See Official Comm. Of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP*, 605 Pa. 269, 301, 989 A.2d 313, 333 (2010) (explaining that, "[u]nlike the legislative process, the adjudicatory process is structured to cast a narrow focus on matters framed by litigants before the Court in a highly directed fashion" (footnote omitted)); *Naylor v. Twp. of Hellam*, 565 Pa. 397, 408, 773 A.2d 770, 777 (2001) (recognizing the Legislature's superior ability to examine social policy issues and determine legal standards so as to balance competing concerns).

obviated by the intermediate court's adoption of an ownership litmus.

Former Justice ORIE MELVIN did not participate in the consideration or decision of this case.

Chief Justice CASTILLE, and Justices EAKIN, BAER, TODD and Justice McCAFFERY join the opinion.